**JS-6**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN LUIS OBISPO COASTKEEPER and LOS PADRES FORESTWATCH,<br><br>Plaintiffs,<br><br>v.<br><br>SANTA MARIA VALLEY WATER CONSERVATION DISTRICT, et al.,<br><br>Defendants. | Case No. CV-19-08696 (AB (LPRx)<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** **[Dkt. Nos. 83, 84]** |

Before the Court are Motions for Summary Judgment ("Motions," Dkt. Nos. 83, 84) filed by the Santa Maria Valley Water Conservation District and its Board of Directors ("District"), and by the United States Department of Interior ("DOI"), the United States Bureau of Reclamation ("Bureau"), and the Bureau's Commissioner Brenda Burman ("Burman") in her official capacity (the "Federal Defendants") (all collectively, "Defendants"). Defendant-intervenors Golden State Water Company ("GSWC") and City of Santa Maria ("Santa Maria") ("Intervenors") filed a Joinder (Dkt. No. 86) in the Motions. Plaintiffs San Luis Obispo Waterkeeper and Los Padres Forestwatch ("Plaintiffs") filed a consolidated Opposition (Dkt. No. 87) to both Motions and the Defendants filed Replies (Dkt. Nos. 96, 94). The Court heard oral argument on January 29, 2021. The Motions are **GRANTED**.

1.

## I. BACKGROUND

### A. Plaintiffs' Complaint

This Order assumes familiarity with the factual and legal background of this case, which the Court previously set forth in its Order Denying Motions to Dismiss ("MTD Order," Dkt. No. 70).

In brief, in this action under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq*., Plaintiffs allege that the manner in which the Defendants manage and operate the Twitchell Dam results in the unlawful take of Southern California Steelhead trout, an ESA-listed endangered species. *See* Compl. ¶¶ 1, 6. The Twitchell Dam is situated on the Cuyama River about 6 miles upstream from the confluence of the Cuyama and Siquoc Rivers, which is where the Santa Maria River begins. *Id.*

Plaintiffs contend that the Bureau of Reclamation's Standard Operating Procedures ("SOP") for Twitchell Dam limits the timing and volume of releases from the Dam to result in "maximum percolation into the ground-water basins and prevent river flows from reaching the Pacific Ocean." *Id*. ¶¶ 39, 40, 63. The Bureau's SOP "prohibits releases from Twitchell Dam that would result in combined instream flows exceeding 300 cubic feet per second at Fugler Point," *id*. ¶¶ 61, 140, which is at the confluence of the Cuyama and Siquoc Rivers. As a result of this constraint on releases from the Dam, the downstream flows in the Santa Maria River are insufficient to connect the upper reaches of the river system to the ocean as needed to establish a pathway for migratory fish passage. *Id.* ¶ 141. This reduces the opportunities for Steelhead migration between the Pacific Ocean and their spawning habitat in the Sisquoc River, resulting in a decline in Steelhead from decreased spawning opportunities, the inability of smolts to migrate downstream to the ocean, and the entrapment of individual fish in channels. *Id.* ¶¶ 15, 112-117, 124, 142-147.

Plaintiffs seek, among other things, an Order requiring the Defendants to "modify operations, including modification of the current flow regime at Twitchell Dam, to come into compliance with ESA Section 9, 16 U.S.C. § 1538. . ." Compl.

Prayer ¶¶ 5, 6. Such an order would compel the Defendants to release from Twitchell Dam, at key times during the wet season, additional water to maintain combined flows in the Santa Maria River system sufficient to provide for fish migration. *Id.* ¶¶ 131, 150, p. 30 (Prayer). These additional releases would result in combined flows exceeding the SOP's maximum limit of 300 cubic feet per second at Fugler Point.

### B. Procedural Background

The Court previously denied motions to dismiss for lack of standing and failure to state a claim, among other grounds. Defendants had argued that Plaintiffs lacked standing because, among other things, they could not show either traceability or redressability because the Defendants lacked the discretion to adjust Twitchell Dam's release regime as Plaintiffs sought. Rather, Defendants' discretion to operate the Dam was constrained by the purposes enumerated in the Congressional legislation that authorized it, and the adjustment Plaintiffs seek is inconsistent with those purposes.

In denying the Motion, the Court analyzed Public Law 774—the 1954 legislation that authorized Twitchell Dam—and some of its legislative history in the light of applicable law. Public Law 774 ("PL 774," Juarez Decl. Ex. E) authorized construction of Twitchell Dam "for irrigation and the conservation of water, flood control, and for other purposes." The parties focused on whether the releases Plaintiffs seek is authorized by the "other purposes" language. The Court found that PL 774's "other purposes" language "vested the Bureau with *some* authority to operate the Dam for purposes other than those specifically enumerated in Public Law 774, and at this stage, the Court cannot find that the other purpose Plaintiffs propose is so contrary to the enumerated purposes that it is impermissible." MTD Order 11:19-12:1. But the Court stressed that its determination was at the motion to dismiss stage where "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The Court also noted that the impact of the Santa Maria Judgment adjudicating the Twitchell Yield was unclear, and that certain potentially germane contractual obligations and complex issues of

California water law were (understandably) not fully briefed. Thus, even though the standing question turned on the interpretation of a statute—a pure question of law—the Court decided that "Defendants' numerous difficult challenges to Plaintiffs' claims . . . must be resolved on a more fully developed legal and evidentiary record." MTD Order 23:22-24.[1]

A year later, the parties have presented a more fully-developed record and more focused briefing on the key issue: does Public Law 774 vest the Defendants with discretion to operate Twitchell Dam such that they may adjust Twitchell Dam's release regime to provide the additional releases that Plaintiffs seek under the ESA? Having carefully considered the record presented and the applicable case law, as discussed below, the Court concludes that PL 774 does not vest Defendants with the authority to operate the Dam as Plaintiffs seek.

### C. Other Preliminary Matters

Defendants initially addressed the issue of their discretion to adjust Twitchell Dam's release regime as Plaintiffs seek as a question of standing—that is, whether the alleged harm is traceable to them, or redressable by them. They now frame the issue of their discretion as whether they can be held liable for actions over which they have no discretion. But whether framed as an issue of standing or of liability, the underlying legal question is the same one of statutory construction. And because the answer is a matter of statutory construction, the Court will not set forth a statement of undisputed facts as it usually does in resolving a motion for summary judgment but instead will simply construe the statute in light of the record presented.

Also, although the Defendants have different roles[2] relative to the operation of

---

[1] For the reasons stated in the Federal Defendants' Reply, the Court rejects Plaintiffs' argument that the law of the case doctrine requires the Court to resolve these questions the same way now as it did in the MTD Order.

[2] As explained in the MTD Order, the DOI oversees the Bureau; the Bureau owns Twitchell Dam and has a right to use water diverted from Twitchell Dam; and the District maintains and operates Twitchell Dam and has the right to all water that

the Dam, it is not necessary to address them separately given the Court's construction of the statute herein. Therefore, the Court will generally refer to the Defendants collectively.

After the Court's MTD Order, the Bureau reviewed the statutory language and compiled the relevant legislative history of PL 774, analyzed the extent of its authority over Twitchell Dam, and produced the Twitchell Memorandum ("Twitchell Memo," 2nd Jackson Decl. (Dkt. No. 84-4), Ex. F). Therein, the Bureau interprets PL 774 as not authorizing it to provide the water releases for the benefit of Steelhead that Plaintiffs seek. The Federal Defendants ask the Court to give this interpretation deference under *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ("*Chevron* deference"), or, failing that, to give it *some* deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ("*Skidmore* deference"); *see U.S. v. Mead*, 533 U.S. 218, 234 (under *Skidmore*, "an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency" that is "proportional to its 'power to persuade'"). Plaintiffs oppose according the Twitchell Memo any deference. The Court has reviewed the Twitchell Memo and finds it persuasive. Nevertheless, the Court finds it unnecessary to formally accord it either level of deference because the Court has considered the entire record before it and finds no significant support for Plaintiffs' interpretation of the statute.

Plaintiffs' papers cite the previously-filed Declaration of Derek Booth (Dkt. No. 37-5) and the Joint Declaration of Peter Moyle, Ph.D., and Scott Cooper, Ph.D. (Dkt.

---

becomes available from operation of the Dam. *See also* Compl. ¶¶ 28, 48, 51, 52, 53. The Bureau issues Standard Operating Procedures ("SOP") that govern operation of the Dam, including the release regime. The District must operate the Dam in accordance with the SOP. Although it was not a conclusive determination, the MTD Order found that the Complaint sufficiently pled that all Defendants were responsible for the alleged take. However, because the Court finds that PL 774 simply does not permit the Dam to be operated for the purposes Plaintiffs seek, there is no need to distinguish among the Defendants.

5.

No. 37-6). These expert reports analyze the impact of the operations of Twitchell Dam on the Steelhead population in the Santa Maria River system. The District filed objections to these declarations. However, these materials are not relevant to the Court's resolution of the Motion, so the Court did not consider them and need not rule on the objections.

Plaintiffs' Response to the Defendants' Statements of Undisputed Facts include a number of objections to how the respective Defendant characterized the underlying evidence. However, because the Court is relying on the underlying evidence itself and not the Defendant's characterizations thereof, these objections are moot.

Finally, the Defendants ask the Court to take judicial notice ("RJN," Dkt. Nos. 84-14, 83-3) of the following: extensive legislative history materials relating to Public Law 774 (2nd Jackson Decl. Exs. A-E, Juarez Decl. (Dkt. No. 83-3) Exs. A-D, F); Public Law 774 (Juarez Decl. Ex. E); the Twitchell Memo (2nd Jackson Decl. Ex. F); sections of the Standard Operating Procedures for Twitchell Dam (2nd Jackson Decl. Ex. G); and state water license No. 19416 and the Contract between the United States and the Santa Barbara County Water Agency Providing for the Construction of the Santa Maria Project. (First Jackson Decl. (Dkt. No. 38-3, pp. 7-18) Exs. C, D.) The District further seeks notice of a map of its boundaries; the March 13, 1957 Grant deed relating to the Santa Maria Project; the Bureau's June 2018 Release Procedure Page; portions of the U.S. Army Corps of Engineers' Reservoir Regulation Manual for Flood-Control Storage at Twitchell Dam and Reservoir ("USACE Manual"); the December 23, 1974 Permit 10271; and the June 30, 2005 Stipulation and the January 23, 2008 Judgment filed in the matter if *Santa Maria Valley Water Conservation District v. City of Santa Maria, and Related Cross-Actions* in the Superior Court of California, County of Santa Clara, lead case No. CV770214. (Juarez Decl. Exs. H, I, K-O). The Court previously took notice of some of these materials. All of these materials are judicially noticeable pursuant to Fed. Civ. P. 201, so the Court takes judicial notice of them.

## II. LEGAL STANDARD

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson*, 477 U.S. at 248–49. A fact is "material" if it may affect the outcome of the case. *Id*. at 248. The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Id*. The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmoving party's favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson,* 477 U.S. at 255). Nevertheless, inferences are not drawn out of thin air, and it is the nonmoving party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

## III. DISCUSSION

The purpose of the Endangered Species Act is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of endangered species and threatened species." 16 U.S.C. § 1531(b). To help achieve this purpose the ESA authorizes citizen suits "to enjoin any person . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof . . . ." 16 U.S.C. § 1540(g)(1)(A); *see also Ctr. For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 804 (9th Cir. 2009) ("The ESA allows a citizen suit for the purpose of obtaining injunctive relief only.").

Plaintiffs' claims arise under Section 9 of the ESA. Section 9 makes it illegal for any person to "take" an endangered species. 16 U.S.C. § 1547(a)(1)(B). "'[T]ake' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). "Harm" means an act that actually kills or injures fish or wildlife and includes "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

Plaintiffs allege that the District and the Federal Defendants commit unauthorized take of endangered Steelhead by the way they regulate and execute releases from the Twitchell Dam: the release limitations modify Steelhead habitat by reducing surface flows in the Santa Maria River, and as a result, during migration times, the River has insufficient flow to sustain Steelhead migration between the Pacific Ocean and their Sisquoc River spawning grounds, or to provide passage for Steelhead smelts to migrate from the spawning grounds to the ocean. This takes Steelhead within the meaning of the ESA because it harms them by impairing behavioral patterns including breeding, spawning, rearing, and migrating, and because it kills or injures individual fish who get stranded in low water during migration. *See*

*e.g.* Compl. ¶¶ 111-115. Defendants contend that they cannot be liable for take under § 9 because they operate Twitchell Dam in accordance with Congressional authorization (as they have since the Dam was completed), and, relatedly, that they cannot modify their operation of the Dam as Plaintiffs seek because that modification is inconsistent with the Congressionally-mandated purposes of the Project.[3]

### A. Defendants Cannot be Held Liable Under ESA § 9 Because they Have No Discretion To Modify Twitchell Dam Releases in the Manner Plaintiffs Seek, and They are Not the Proximate Cause of the Alleged Take.

"Congress has placed limitations on permissible uses of project water and has established priorities among uses since the very inception of federal reclamation law," and "[t]hese directives are binding on the Secretary and on those seeking to obtain project water." *Jicarilla Apache Tribe v. United States*, 657 F.2d 1126, 1139–40 (10th Cir. 1981). Thus, unless the water use that Plaintiffs seek here is consistent with the purposes Congress set forth in PL 774, then Defendants cannot provide water for that purpose.

Furthermore, an ESA § 9 claim cannot succeed unless the defendant's act is the proximate cause of the alleged take. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 696 n.9, 700 n.13 (1995). Correspondingly, if the agency "has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767-70 (2004); *accord Nat. Res. Def. Council v. Norton*, 236 F. Supp. 3d 1198, 1239 (E.D. Cal. 2017) (applying *Public Citizen* to the question of whether a nondiscretionary action can give rise to an ESA § 9 claim, and finding it inappropriate "to impose Section 9 liability on a government agency for take caused by an action over which it has no control"). Thus,

---

[3] Defendants moved for summary judgment on other grounds as well, but the Court will not address them.

9.

if PL 774 does not give Defendants discretion to operate Twitchell Dam as Plaintiffs seek to avoid take, then Defendants are not a proximate cause of the alleged take and Defendants cannot be liable under ESA § 9.

Thus, the Court must determine whether PL 774 vests Defendants with the discretion to adjust water releases from Twitchell Dam as Plaintiffs seek.

### 1. Public Law 774 and Its Legislative History

Defendants filed extensive legislative history materials for PL 774, along with PL 774 itself. Relevant excerpts from this history are presented in the Defendants' Statements of Undisputed Facts. *See* SUFs (Dkt. Nos. 84-2, 83-2), District's Reply SUF (Dkt. No. 93). Plaintiffs' Response (Dkt. No. 88) to these SUFs does not create any genuine issue of material fact. But, instead of citing the SUFs the Court will quote this legislative history material directly. However, because the material is repetitive and lengthy, the Court will quote only representative portions of it.

The language of the statute, the Report referenced therein, the supporting documentation, and legislative history are all relevant to resolving this question. For example, in *Jicarilla Apache Tribe*, the issue was whether Congress authorized the use of reclaimed water for recreational purposes when it authorized a water storage project "for the purposes of, *among others*, . . ." 657 F.2d at 1139 (emphasis added). The Tenth Circuit noted that the authorization left "the recognized purposes open-ended by inclusion of the phrase 'among others.'" *Id.* The Circuit considered the statute, the report referenced in the statute, reports issued by the Bureau of Reclamation, and other "background materials" to interpret Congress's authorization of the project "for the purposes of, *among others*, . . ." 657 F.2d at 1139-1145. (emphasis added). Accordingly, this Court will rely on comparable materials to interpret the phrase "other purposes" in PL 774.

Twitchell Dam[4] was authorized by Congress in 1954 when it adopted PL 774.

---

[4] The Dam was initially called Vaquero Dam, but is now called Twitchell Dam.

PL 774 "authorized [the Secretary of the Interior] to construct the project for irrigation and the conservation of water, flood control, and for other purposes . . . substantially in accordance with the recommendations of the Secretary of the Interior dated January 16, 1952, entitled 'Santa Maria project, Southern Pacific Basin, California' ['Report']. . ." Public Law 774 (Juarez Decl. Ex. E). PL 774 also provides that "in view of the special circumstances of the Santa Maria project ["Project"]," certain laws requiring a contract for repayment are not applicable "so long as the water utilized on project lands is acquired by pumping from the underground reservoir." *Id.*

The Secretary of the Interior's Report in turn references the water conservation, irrigation, and flood control purposes of the Project throughout, and states that these purposes will be achieved by retaining water behind Twitchell Dam and releasing it in a controlled manner so it will percolate into the underground reservoir for later use. *See* Report (Juarez Decl. Ex. F). Such references are easy to find in the Report and other sources of legislative history, such as the Congressional hearing transcripts Defendants provided, and Defendants catalogue some of them in their papers. The Court recites only some of them. For example, in describing the "Anticipated operation" of the Dam, the Report states that, "The operation of this reservoir for conservation storage would be such that water impounded in the silt and conservation space would be detained for later release in underground storage at the percolation rate of the channel downstream. Since the ground-water reservoir beneath the Santa Maria Valley has ample storage capacity, and since the percolation rate of the riverbed ravels is sufficient in most cases to absorb all waters detained in the reservoir before the next runoff season, no holdover storage is required." Report p. 47. The Report states that to achieve "maximum yield from reservoir operation" and "obtain maximum percolation into the groundwater basin," water conserved behind the Dam should be released at rates equal to or less than the percolation capacity of the river channel, which is 300 cfs at Fugler Point. *Id.* p. 54. This was the basis for the Bureau's SOP establishing a release regime of 300 cubic feet per second maximum

11.

combined flow at Fugler Point.[5]

The Report also indicates that "other water uses" include supplying water for municipal and industrial purposes, such as for residents of the city of Santa Maria and for oil refineries and sugar-beet processing plants. *See* Report p. 37. In addition, the cover letter for the Report likewise explains that the operation of the Project would "provide adequate recharge of the now critically depleted groundwater reservoir [], provide municipal water for anticipated municipal and industrial growth, and remove the threat of extensive flood damage to the cities, 3000 acres of presently unirrigated land could be brought under irrigation . . . There is an immediate need for the project to prevent the return of some 8,000 irrigated acres to dry farming, to arrest the constantly increasing cost of pumping, to remove the threat of salt-water intrusion into the basin." Report p. 15.

Furthermore, in a section titled "Recreation, Fish, and Wildlife," the Report considered the Project's impacts on the Steelhead. *See* Report p. 69-70. In brief, the Report states that "Steelhead trout would not be able to enter the river as often as without the project, and as a result the project would cause a small fishing loss." Report p. 70. However, there was not a large quantity of Steelhead present in the river so the loss would not be significant. *See* Report p. 89. In a comment letter that was incorporated into the Report, the California Department of Fish & Game stated: "Runs of steelhead have been rather unstable, being dependent upon the uncertain runoff. During the past 7 dry years, of course, conditions have been unsuitable for the entry of steelhead from the ocean. In light of the situation described above, we do not

---

[5] The SOP's Release Procedures state, as relevant: "Water conservation releases [from Twitchell Dam] are coordinated with the unregulated flow of the Sisquoc River such that combined flows at Fugler Point do not exceed 300ft 3/s, which is the percolation capacity of the Santa Maria River aquifer. Any flow in excess of 300 ft 3/s remains surface flow and is wasted (for purposes of conservation) to the Pacific Ocean. If the Sisquoc River flows alone exceed 300ft 3/s at Fugler Point, no releases are made from Twitchell Reservoir." Juarez Decl. Ex. K.

feel justified in requesting extensive requirements in an attempt to perpetuate the steelhead runs. For example, we will not require a fish ladder at Vaquero Dam for passage of migratory fishes. Also, because of the great width and pervious character of the riverbed below the proposed dam, we do not believe that it would be feasible to request a regular schedule of water release for maintenance of a stream fishery." Report p. 112. Thus, the Report recognized the impact of the Project on Steelhead but did not recommend using water conserved by the Project for the benefit of Steelhead.

The House debate record reflects that Representatives specifically asked whether any impounded water would "go out to sea," and the response was that the "water [would be] confined to a reservoir [] and would be held there in reserve and used for the purpose of being pumped out by private individuals to supply their land for irrigation." *See* 100 Cong. Rec. 1120 (1954) p. 1141 (Juarez Decl. Ex. B (Dkt. No. 83-4) p. 95).

In the Senate, the Project was further described as follows: "Construction of the [] Vaquero Dam and Reservoir [] would make possible the retention of waste water during flood periods and the later release of this water during the dry season into the Santa Maria River channel, at a rate not greater than the percolation capacity, thus providing for the entire store flow to seep into the underground storage basin (i.e., ground-water reservoir). No surface-water delivery would be made to irrigators. Thus, floodwater which would otherwise be wasted will be conserved and placed in the underground storage basin. At least this is the intention of the project." *See* 100 Cong. Rec. 14182 (1954) p. 14249 (Juarez Decl. Ex. C (Dkt. No. 83-4) p. 108).

### 2. PL 774 Does Not Authorize the Use or Purpose Plaintiffs Seek.

The question before the Court is whether Public Law 774 permits the Bureau to use any water from Twitchell Dam for the purpose sought herein—to release Project water that would flow to the ocean for wildlife conservation. The parties agree that the express purposes of irrigation, water conservation, and flood control do not encompass this purpose. However, Plaintiffs argue that Congress's authorization of

13.

the Dam for unspecified "other purposes" vests the Bureau with discretion to adjust the release regime to accommodate the Steelhead. Defendants argue, however, that "other purposes" are permissible only if they do not conflict with PL 774's enumerated purposes of "irrigation and the conservation of water, [and] flood control." Defendants argue that because the release regime Plaintiffs seek would exceed the river channel's percolation capacity and would necessarily result in water flowing into the ocean instead of being conserved in the underground reservoir, it conflicts with PL 774's express conservation purpose. As such, additional releases for the benefit of Steelhead are not a permissible "other purpose" and are beyond the Bureau's authority to implement. The Court thus considers whether "other purposes" can include the releases Plaintiffs seek.

Both sides rely on the legal standard articulated in *Britt v. U.S. Army Corps of Engineers*, 769 F.2d 84 (2nd Cir. 1985)[6]: "that modifications by the Chief of Engineers in a project such as this are within the scope of his authority *unless they are so foreign to the original purpose of the project as to be arbitrary and capricious*." *Britt*, 769 F.2d at 89 (emphasis added). Applying this rule, the Second Circuit held that relocating a bridge 1.25 miles away from its planned location was not foreign to the original purpose of the project because it would sufficiently serve the same travelers who needed to cross essentially the same part of the bay. *Id.* With regard to modifying a project's purpose and not just its engineering plan, the *Britt* Court also approved as "eminently sound," *Britt*, 769 F.2d at 79, the Fifth Circuit's rule that "[e]ven when a project's purpose is authorized by Congress, the executive officer charged with responsibility for the project may modify its purpose unless this action is so foreign to the original purpose as to be arbitrary or capricious." *Creppel v. U.S. Army Corps of Engineers*, 670 F.2d 564, 572 (5th Cir. 1982).

---

[6] The MTD Order discussed *Britt*'s facts and did not find them instructive for this case. The Court will not repeat that discussion here.

Applying this standard to the proposed use here, the Court finds that operating Twitchell Dam in the manner that the Plaintiffs propose is so foreign to the original express purposes of Twitchell Dam as to be arbitrary and capricious. This is because releasing water that will necessarily flow into the ocean—as Plaintiffs seek—conflicts with the express water conservation purpose of Twitchell Dam. To fulfill the Project's express purposes, the Report and other legislative history is replete with discussion of salvaging, conserving, and storing water as groundwater in the underground reservoir for later use by pumping. The Report expressly contrasts water conservation with the concept of "waste," which means a flow of water to the ocean. *See* Report p. 23 ("These conditions [lack of adequate water supply and the threat of floods] which hamper the continuation of stable development of the valley economy can be removed by conservation of floodwaters presently wasted to the ocean and by construction of works to control the floods."); *see also City of Santa Maria v. Adam*, 211 Cal. App. 4th 266, 280–81 (2012), as modified on denial of reh'g (Dec. 21, 2012) ("*Adam I*") (observing that "[i]f [high river flows are] not collected behind dams and stored in reservoirs, most of [them] would waste to the sea in the winter and the rivers would run low or dry in the summer months," and the plan was for Twitchell Dam "to save floodwater during the rainy season and release it 'in such manner and at such times as will provide maximum contributions to the ground water supplies…'"). Thus, a fundamental function of the Project authorized by PL 774 is to salvage all water that would otherwise be wasted to the ocean, and then conserve it underground by maximizing groundwater recharge by limiting releases from the Dam such that the flow does not exceed the percolation capacity of the riverbed. Furthermore, the Report reflects that providing flows for perpetuating Steelhead migration was considered but not included and therefore was a rejected "other purpose" of the Project.

Plaintiffs argue that the above interpretation of "other purposes" is too narrow, given that the Santa Maria Water Rights Adjudication previously construed "other purposes" to authorize using 80% of the Twitchell Yield for municipal water supply

and industrial purposes, neither of which are *express* purposes stated in PL 774. *See* Opp'n 23:8-21. As noted in the MTD Order, the California Court of Appeal opinion in *Adam I* in the Santa Maria Water Rights Adjudication rejected an argument made by farmers that allocating 80% of the Twitchell Yield to municipal and industrial purposes was not permissible because those purposes were not irrigation. Instead, the *Adam I* Court found that municipal and industrial uses were permissible "other purposes." *See Adam I,* 211 Cal. App. 4th at 307-309. The *Adam I* Court observed that, consistent with California water law and the contract between the Bureau and the SBCWA[7], the Bureau applied for and secured from the state a permit to appropriate Twitchell water for "irrigation, domestic, salinity control, and incidental recreation" uses, and for "municipal and industrial" uses. *Adam I*, at 309. The *Adam I* Court determined that because "Congress explicitly authorized multiple uses for Twitchell water and the Bureau of Reclamation implicitly approved municipal and industrial uses by requesting and receiving the right to appropriate water for those purposes, allocation of a portion of the Twitchell Yield to municipal and industrial users does not represent a change in use for which federal law requires concurrence of the Secretary." *Id*.

      The MTD Order relied on this reasoning to provisionally find that "other purposes" *could potentially* be as broad as Plaintiffs argue. But, upon further review, *Adam I* does not aid Plaintiff. *Adam I* specifically dealt with allocation of the Twitchell Yield, that is, water already conserved by Twitchell Dam and stored as groundwater by virtue of the release regime that avoids waste and maximizes aquifer recharge. By contrast, the releases Plaintiffs seek is surface water, and those releases would not be a part of, but instead would divert water from, the Twitchell Yield. The municipal and industrial uses in issue in *Adam I* did not involve permitting water to

---

[7] The Santa Barbara County Water Agency ("SBCWA") was the District's predecessor.

16.

"waste" to the ocean, but were the results of the opposite—of fulfilling the water conservation and groundwater recharge purpose of the Project. Simply stated, *Adam I*'s reasoning applies to Twitchell Yield water, not to surface water retained behind the Dam, which is the water Plaintiffs wish to use. By contrast, the purpose Plaintiffs propose would cause surface water retained behind the Dam to waste to the ocean and not become part of the Twitchell Yield. Furthermore, the more extensive legislative history materials now before the Court show that municipal and industrial purposes were in fact among the "other purposes" of the Project contemplated and authorized by PL 774. *See* Report p. 15, 37 (referring to the Project supplying groundwater for municipal and industrial purposes).

Plaintiffs also point to language in PL 774 permitting the Project to proceed "substantially in accordance" with the Secretary's Report, and argue that the amount of water they want released is so small that the Project will still operate "substantially in accordance" with the Report. Indeed, the Court hypothesized to this effect in the MTD Order, offering that perhaps the issue turned on how much water would be released in excess of the percolation capacity of the riverbed. However, this approach is not supported by any analogous cases addressing whether unspecified other purposes/uses that conflict with enumerated purposes are permissible as long as those other purposes/uses are limited in scope and thus create only a small conflict. Furthermore, this is not a workable approach: any amount of water released in excess of the percolation capacity of the riverbed conflicts with the Project's enumerated purposes and overall design and philosophy of avoiding waste to the ocean and instead conserving water to recharge the aquifer for later use by pumping. *See Jicarilla Apache Tribe,* 657 F.2d at 1138 (rejecting use of water "because it is out of harmony with the entire basic philosophy of this project . . ."). It is not a matter of degree. The use Plaintiffs seek is not incidental to the express purposes of the Project, but instead is a wholly different purpose that detracts from fulfilling the Project's express purposes.

17.

Based on the foregoing, the Court finds that the "other purposes" authorized in Public Law 774 do not include releasing water from Twitchell Dam beyond the percolation capacity of the riverbed because such water would not be conserved to recharge the aquifer, and thus would conflict with and undermine the express water conservation purpose of the Project. Plaintiffs seek additional releases from Twitchell Dam that would exceed the percolation capacity of the riverbed, but PL 774 does not authorize such releases so Defendants are not empowered to provide them. Accordingly, Defendants lack the discretion to act as requested, and therefore are not the proximate cause of the alleged take, nor can they provide a remedy.

Although the same question of law was presented in the motions to dismiss, the Court permitted this action to proceed beyond that stage primarily to permit a more in-depth and focused examination of the "other purposes" language in PL 774. But the additional legislative history that Defendants have presented demonstrates the lack of any disputed question here, and the additional briefing on the law simply provides no substantial support for Plaintiffs' argument that "other purposes" includes purposes that conflict with the enumerated purposes of the Project.

Plaintiffs argue that the Court can "reconcile" PL 774 and ESA § 9 by construing "other purposes" to include wildlife conservation. But there is nothing to "reconcile" because the Defendants do not violate the ESA when, as here, their action or inaction is not the proximate cause of the alleged take because they lack discretion to act otherwise.

In sum, the Court finds that the surface water releases from Twitchell Dam that Plaintiffs seek for the benefit of Steelhead is not an "other purpose" authorized by PL 774. Furthermore, such releases would conflict with the express purposes and operation of the Project, and therefore such releases would not be "substantially in accordance" with the purposes and plans set forth in the Report.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment are **GRANTED**. Defendants are **ORDERED** to jointly file a Proposed Judgment within five days of the issuance of this Order. Plaintiffs shall have five days to file any objections thereto.

The Pretrial Conference and Jury Trial dates are vacated.

**IT IS SO ORDERED.**

Dated: April 15, 2021

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE